## CLARENCE C. WALKER CIVIC LEAGUE et al. v. BOARD OF PUBLIC INSTRUCTION FOR BROWARD COUNTY, FLA., et al.

### No. 11473.

Circuit Court of Appeals, Fifth Circuit.

April 12, 1946.

L. E. Thomas, of Miami, Fla., and S. D. McGill, of Jacksonville, Fla., for appellants.

Julian E. Ross, of Fort Lauderdale, Fla., and T. D. Ellis, Jr., of Hollywood, Fla., for appellee.

Before SIBLEY, WALLER, and LEE, Circuit Judges.

WALLER, Circuit Judge.

Certain negro citizens, parents of children attending the Dillard colored public school of District No. 3, in Fort Lauderdale, Broward County, Florida, appealed from a decree of the District Court wherein the Court refused to issue an injunction and to declare the law, as they deemed it to exist, in their suit against the Board of Public Instruction of that County.

The fertile Everglades section of Broward County, near Fort Lauderdale, usually, and especially during the recent war, was widely devoted to the raising of vegetables, particularly beans. During the

bean-picking season the Board of Public Instruction directed that a split session should be had in the Dillard School. This split session, so the Plaintiffs allege, and we think the proof shows, was ordered chiefly for the purpose of rendering the colored children of said school available to aid in harvesting the bean crop. No split session was ordered for any white school within the area. Plaintiffs allege that the ordering of this split session, even though approximately a nine-month session was ultimately supplied, definitely interfered with, and hindered, the education of their children and was an arbitrary, willful, and unconstitutional discrimination against the children of said school, solely on account of their race or color.

The defendants denied: (1) that the closing of the said school during the winter farming season had resulted in denying negro children the legal minimum of eight months of school, or that they had adopted a policy to that effect; (2) that they were operating so as to discriminate against the colored pupils on account of race or color; (3) that the policy or practice followed was detrimental or injurious, but that, on the contrary, the policy and plan adopted was believed to be to the best interest of the greatest number. They alleged that during the bean-picking season the attendance at this school customarily dropped considerably because a large number of the children from the Dillard School usually worked as bean pickers; that approximately ninety-five per cent of the bean pickers in the community were negroes; that on account of the war, the shortage of labor, and the shortage of food, an emergency of real magnitude existed.

The Board denied that the closing of the Dillard School during the winter farming season is an established practice or custom, but it asserts that such closing was resorted to only during the three sessions of the school held since the beginning of the late war, and only during and because of, the emergency created by food and labor shortages and the exigencies of war; they denied that a continuous, unbroken term is of such distinct advantage as to compel the Board to disregard other factors, such as delinquency in attendance during the bean-picking season, financial necessities of students and their families, high wages, reduction of State aid, and aid to the war effort; that in the adoption of the regulation for closing the school during those farming seasons the Board had "exercised its discretion in a manner for the best interest of the negro school children and in a manner beneficial to the war effort."

The defendants further alleged that Broward County is largely an agricultural county in which vegetables are grown in the winter months but which produces little or no agricultural products during the summer; that in the past the Board had found that during the winter vegetable season many negro children, duly enrolled in the public schools, had left school to work in the bean fields in order to make extra money, thereby bringing about a lessening of attendance in the schools, which resulted in the receipt of less State aid, the employment of fewer teachers, with a consequent detriment to the whole county school system and all its pupils, since State aid is based upon average school attendance in the county.

The Board produced attendance records and demonstrated the fact that in the winter months the average attendance record in the Dillard School was considerably lower than the attendance in the same school during months in which the agricultural activities were not great.

The Court below found that the decision of the Board to fix the terms so as to permit the negro students to seek employment in harvesting winter vegetables was predicated upon the following reasons:

(a) That there was a high degree of absenteeism or delinquency in attendance in the negro school when the school was operated during the winter farming season.

(b) The national labor shortage, causing a greater demand for laborers at high wages, would tend to increase the percentage of absenteeism.

(c) That the national war effort demanded that more foodstuffs be produced for the fighting front and the home front.

(d) The upsetting of the school budget, particularly that part paid by the State of Florida in the amount of $800 per teacher unit, based upon average daily attendance.

The lower Court further found that the Board had not unconstitutionally discriminated against the members of the negro race on account of their color in fixing a different time for opening and closing of the Dillard School from that of the opening and closing of the white schools in the district; and that no discrimination, inequality, or injustice had resulted since it

appears that the colored pupils of said school would get a term of 8¾ months, which was equivalent in length to the nine-month term of the white children when consideration is taken of the fact that there would be no loss of time to the colored children during the Christmas holidays as occurred in the schools having no split sessions. The lower Court dismissed the complaint on the ground that the plaintiffs had failed to make out a case entitling them to any relief.

That the School Board cannot discriminate against negro children on account of their race or color is so well established as not to require either citation of authority or elaboration. Article XII, Section 12, Constitution of Florida, requires that impartial provision shall be made for both the white and colored children in the public schools. Without doubt the Board does not have the right to deprive negro children of educational advantages which the State law has provided, in the absence of grave emergency, merely in order that they should be available for agricultural labor. But the question involved here is not so simple. The needs of the nation at war, the national emergency thereby created, the financial factors relating to the loss of State aid due to the absenteeism during the agricultural season, the economic factors that affect the children and families of those who traditionally follow such agricultural pursuits, the high wages or economic advantages obtainable by that class of workers, and who, before the emergency and from time immemorial, have been among the nation's low-paid workers, the discretion which the law gives to such boards, so enlarge the horizon of the question of discrimination as to include vistas far beyond the boundaries of things justiciable.

Whether a continuous session of school is more advantageous to the children and their parents than the economical advantages derived from the opportunity to obtain high wages during a few months, requires a comparison that this Court does not feel equipped to make. The answer as to what is the obligation to the nation at war of those who, by virtue of their usual occupation and training, are equipped to harvest badly needed crops does not appear to reside either in the precedents or the conscience of courts. The fact that the local boards were authorized to put agricultural workers in a special classification with consequent deferment from military service is illustrative of the fact that during the war emergency the Congress deemed agricultural workers to belong to a class separate and distinct from those who are not such workers, and no court has held that such classification was unconstitutional. We do not feel secure in saying that the School Board in such an emergency might not also make special provision for a recognized group of agricultural workers which might not necessarily be applicable to all pupils. If in the making of a regulation affecting agricultural workers, most of them came from the Dillard colored school, would it follow as a matter of law that the Board had discriminated against negro pupils solely on account of race or color, merely because of the fact that agricultural laborers in that area happened to be colored and to go to the Dillard School?

If there was discrimination against these pupils, was it because they were black or was it because they were agricultural laborers?

It is not unusual in many rural sections of the South to suspend schools, both white and colored, during the cotton-picking season while schools in the towns and cities are not so suspended; nor is it unusual during seasonal operations such as strawberry picking to suspend the schools so that the children, white and black, may aid their parents in the process and later attend a summer session commonly called a "strawberry school". Such instances have not been deemed an unlawful discrimination against such school children in favor of students in city schools.

If in the present case the School Board had made separate provisions for students who were also farm workers as a class, and if such classification or special treatment of agricultural laborers was reasonable, such action would doubtless not be in violation of the Constitution and might be beneficial, instead of detrimental, to such students.

We are satisfied that the Board ordered a split session of the Dillard School because it had a large number of students who were customarily agricultural workers and who it was thought, because of custom and because of the record of previous absenteeism, would go into the bean fields, rather than because the students were negroes. There would have been no logic in releasing them for work in the bean fields merely because they were colored if the Board had

not believed that usually large numbers of them traditionally worked as agricultural laborers in the bean fields, and that they would do so again, especially if there were no school in session at the time. We find no evidence in the record to support the conclusion that the alleged discrimination against the students was "solely on account of their race or color".

We do not believe that any question [or federal question, at least] is raised on account of any alleged discrimination between the agricultural workers and the nonworkers in the Dillard School. Moreover, the questions as raised involve the exercise of a discretion which definitely was not committed to the courts.

With no statute to serve as a yard stick, we are called upon to measure the width of a board's power and the depth of a group's duty in a national emergency; without knowledge of the economic necessities of the students—or their parents, who are entitled to their earnings during minority,—and without the wisdom or the experience with which to strike a balance between the pecuniary advantages of highly paid employment and the mental and social acquisitions of a continuous school session, we are asked to adjudge that those to whom the law has assigned the problem were in purposeful error in their solution.

During the financial depression of the early thirties such an opportunity to earn any wage, much less such high wages, would have been considered as manna from heaven, and this Court, hoping, but in no wise vouchsafing, that there never will be another such depression, does not wish to lay down an iron-bound and copper-riveted rule that would unduly, and we think unnecessarily, hamstring such boards, especially since the emergency which the defendants set up as the main justification of their action has ended. A warring world has stacked its arms, for the time being at least, and the most persuasive reason for the arrangement has ceased to exist. Prior to the war emergency the Board had not ordered the split session of the school. If more detriment than advantage is wrought by the arrangement, we may indulge in the presumption that public officers will do their duty and return to the normal operation of the school in effect before the occurrence of the war emergency. It would no longer be justified in ordering such split session because of a war emergency. In

the absence of any showing of probability that the practice will continue we do not deem that it is necessary to issue an injunction in the present state of the case.

The decree of the Court below is affirmed but without prejudice as to the future operation of said school.

Affirmed.