Allie K. McCORD; Joseph Powell, Jr.; Rose Marie Saulsby; Ilma M. James; Margaret Harden; Alzen F. Floyd, Sr.; and the Southern Christian Leadership Conference (SCLC) of Broward County, Florida, on Behalf of themselves and all others similarly situated, Plaintiffs,

v.

CITY OF FORT LAUDERDALE, FLORIDA; Robert A. Dressler, Mayor of Fort Lauderdale; Robert O. Cox, Vice-Mayor; Virginia S. Young, Mayor Pro-Tem; Commission Members of the City of Fort Lauderdale, Florida, Richard A. Mills, Jr.; and John E. Rodstrom, Jr.; their successors and agents, all in their official capacities, Defendants.

No. 83–6182–Civ–NCR.

United States District Court,
S.D. Florida,
Fort Lauderdale Division.

March 12, 1985.

David M. Lipman, Miami, Fla., Benjamin F. Lampkin, Fort Lauderdale, Fla., Clyde E. Murphy, New York City, for plaintiffs.

Mark R. Boyd, Fort Lauderdale, Fla., Vincent Fontana, New York City, for defendants.

## OPINION

ROETTGER, District Judge.

Plaintiffs sued the city of Fort Lauderdale, claiming violation of the Voting Rights Act, 42 U.S.C. § 1973 in the city's at-large elections for city commissioner.

It is important to bear in mind that an attempt to discriminate or a discriminatory

motive is not required under the act following the 1982 amendment. Now, a sufficient violation is shown if a discriminatory purpose or result may be inferred from the voting practices.

The exact wording of the statute, as amended, is as follows:

**§ 1973. Denial or abridgement of right to vote on account of race or color through voting qualifications or prerequisites; establishment of violation**

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population. (As amended Pub.L. 97–205, § 3, June 29, 1982, 96 Stat. 134.)

The trial evidence focused on the elections held since 1970, primarily because the serious efforts in a black candidacy began about that time. The candidacies prior to about 1970 on the part of black candidates appeared obviously to be a "testing of the waters," while the candidacies beginning about 1970 have been definite efforts on the part of all candidates, with perhaps one exception.

Both sides treated 1970 as if it were the important starting date for our critical examination although the matters prior to then were covered in the evidence by both sides possibly for historical completeness. E.g., plaintiffs' exhibit 1 (PX1) gives exhaustive detail of the elections since 1970.

Since 1970 there has been an election in 1971, 1973, 1975, 1977, and in both 1979 and 1982 for three-year terms. All of the commissioners have been white throughout this period, except Fort Lauderdale elected a city commissioner, who was black, in the at-large elections in 1973, 1975, and 1977. That candidate was the same person, Andrew De Graffenreidt.

*Key Facts for a Frame of Reference*

There is no dispute between the parties as to the following:

1. There have been four "open seats"— no incumbent running—since 1970. The parties agree that open seats are the key races to demonstrate electability.

2. Twenty-one percent of the city's present population is black.

3. One open seat was won by Mr. De Graffenreidt, who is black, in 1973, and he was re-elected in 1975 and 1977.

4. In 1975 and 1977 Mr. De Graffenreidt received enough votes in identifiable white precincts to win election as commissioner without any votes from black precincts.

5. Arthur Kennedy, also black, lost by a narrow margin in the last election in 1982.

6. Black voter turnout has equaled (within one percentage point) or exceeded white voter turnout (often substantially), percentagewise, in every election since 1970 but one.

7. Since the city's founding in 1911, commissioners (formerly council members) have been elected at large.

And, although not conceded by plaintiff, Fort Lauderdale is not a part of the "Old

South"; instead, most of its white citizens come from the Northeast or Midwest.

These facts and others relevant to this decision will be treated in more detail throughout this opinion.

### Historical Background of City's Electoral System

The city of Fort Lauderdale was incorporated by the Florida State Legislature in 1911. From 1911 to 1925, Fort Lauderdale was governed by a Mayor-Council form of government; and since 1925 the city has maintained a Mayor-Commission form of government. Since 1911 there have been five members on the Fort Lauderdale City Council or Commission (the term Commission has been utilized since 1925).

From 1911 to 1917 the mayor served one year and the council members for two years with staggered terms. In 1917 and continuing to 1921, the mayor and the council served two years, with the council serving staggered terms. Of the five council members elected in 1922, the two candidates receiving the highest number of votes served two years, and the two candidates receiving the lowest number of votes served one year. In 1923 the mayor and council were elected for one year; two years with concurrent terms in 1925; two years with staggered terms from 1929 to 1947. From 1947 to 1951, commissioners were elected for four-year staggered terms, and from 1951 to 1979 they served two-year concurrent terms. Since 1979, the mayor and commissioners have served three-year concurrent terms.

### Election of Council Members and Commissioners by Ward, Districts, or At-Large

Since 1911 council members or commissioners have been elected at-large. From 1913 to 1923, four of five commission members were elected at-large, but they ran from districts in which they resided. One of five ran at-large, but not from any district. The residency requirement was deleted from 1923 to 1929. From 1929 to 1947, the four and one´ split was again instituted, but from 1947 to the present, the system has been that all commissioners are elected at-large, but with no residency requirements.[1] In the 1979 election, only four commissioners were elected at-large with the fifth running separately as mayor, also at-large, but in 1982 the separate mayoralty race was abolished with all five commissioners being elected at large, as usual. City commissioners are elected by plurality vote in both the primary and general elections. In the primary election, the 10 candidates who receive the highest number of votes become candidates in the general election; and in the general election, the five candidates who receive the highest number of votes become city commissioners.

Since 1913 the candidates elected to office were those receiving a plurality of votes. The one receiving the highest number of votes was declared to be the mayor-commissioner, and the one receiving the second highest was declared to be vice-mayor-commissioner.

There is no white or segregated primary in the city of Fort Lauderdale. There is no prohibition against single-shot voting. There is no requirement for majority vote and there never has been except from 1923 to 1925. During that period, the majority vote requirement was used when there were only two candidates. In those elections during this period, where there were more than two candidates for a position, only a plurality of votes was required to be elected. Therefore, as a practical matter, there never has been a requirement for a majority vote, even during those two years.

### Population and Demographic Statistics for the City

The population of Fort Lauderdale in the 1980 census was a total of 153,279, of

1. However, plaintiffs in this case rejected this solution of a residence district requirement from five districts in the city with at-large voting for the elections of persons from the various districts, despite the fact this would almost guarantee the election of a black commissioner. This proposal was made by the court in an effort to resolve the situation without extensive litigation.

whom 32,225 (21%) were black. Fifty years earlier, the 1930 census showed a total population of 8,666, of whom 1,994 (23%) were black.

The city produced expert testimony [2] that Fort Lauderdale has only 23% native Floridians, a much lower figure than for several other cities in Florida. An examination of the demographic patterns of immigration from 1975 to 1980 indicates that 45% of Fort Lauderdale's residents came from the northeastern part of the United States, 18% from the Midwest, and only 17% from other southern communities. This demographic pattern is similar to prior demographic patterns.

The evidence reveals that Fort Lauderdale is a part of "New Florida" with a more tolerant and unbiased racial attitude while some other comparative communities in Central and North Florida reflect "Old Florida," which itself is like the "Old South."

### Black Candidates for the Fort Lauderdale City Commission

The black candidates prior to about 1970 appeared to be largely a testing of the political waters and began with Nathanial Wilkerson in 1957; almost no evidence was introduced as to his campaign. In 1963, Thomas Reddick, a lawyer, ran for city commission, and in 1967 a full slate of five candidates, all of whom were black, ran for city commission: Horace Lewis, Helen Morris, Edison Wheeler, Tom Reddick, and Walter Sullivan. The announced purpose of the campaign, according to Commissioner De Graffenreidt, was to see if black voters would go to the polls. In 1969 and 1971, Alcee Hastings, a lawyer and presently a United States District Judge, ran, but finished seventh.

In 1973, Andrew De Graffenreidt ran for the city commission and was elected; Commissioner De Graffenreidt was re-elected in both 1975 and 1977. In 1979, Commissioner De Graffenreidt ran for re-election as a city commissioner and was narrowly defeated, for reasons to be discussed at more length later. In 1982, two black candidates ran: Arthur Kennedy, President of the Broward Classroom Teacher's Association, narrowly lost, and a young college student, Louis Alston, ran with a rather unsubstantial showing.

The comments of the candidates about their own races are instructive as to their respective defeats. Tom Reddick, who ran in 1963 and 1967, analyzed that Republicans were getting elected in his campaigns and he was a Democrat. Horace Lewis, who ran in 1967, spent less than $100 and took out no ads. Helen Morris, who also ran in 1967, took out only one ad and limited her campaigning to one street. Neither Morris nor Lewis had been active in city affairs before then, although Morris has since been appointed to serve on an advisory board.

Alcee Hastings, a candidate in 1969 and 1971, attributes his election difficulties to many things: Someone gave him 5,000 bumper stickers but because they did not have the union "bug" on them, the unions were mad at him. He attributes his drop from fifth or sixth in 1969 to seventh in the general election to the fact that more people knew he was black; he further felt that black Democrats support white Democrats but not vice versa.

In 1973, 1975, and 1977, Andrew De Graffenreidt was elected, but then after two races for other positions lost in 1979. (His successor, Bert Frazer, ran but was defeated in 1982.) The matter that seemed largest to Commissioner De Graffenreidt for his defeat was "because I resigned to run [for the county commission in 1978] and was reappointed [by his fellow members on the Fort Lauderdale City Commission], the press was unsupportive." The Fort Lauderdale News did not endorse him in 1979 because of that, although he had enjoyed the endorsement of The Fort Lauderdale News in previous campaigns. The State of Florida requires that one must resign to run for a state office. Consequently, in 1976 when Commissioner De

2. Professor Susan A. MacManus, Cleveland State University, Cleveland, Ohio.

Graffenreidt ran for Congress, he did not resign, but when he ran for the county commission in 1978, he had to resign his city of Fort Lauderdale City Commission post. The other city commissioners—all white—deliberately kept the position vacant until they saw what the results of the county commission race would be. When Commissioner De Graffenreidt lost, he was reappointed by his fellow members of the city commission to his old seat.

Additionally, Commissioner De Graffenreidt felt the voters were unhappy because he had opposed buying the Bartlett Estate (the last large available undeveloped tract on Fort Lauderdale Beach), and he blames that for a drop in his vote totals. Not only did he oppose it, but Commissioners Young and Mills also opposed it and their vote totals dropped, too; however, the city's overall vote totals dropped 3,546 votes from the 1977 election to the 1979 election, with the totals for Mayor Shaw—running specifically for mayor this time—dropping by 2,134 votes. Commissioners De Graffenreidt, Young, and Mills dropped their vote totals by 2,165, 1,960, and 1,474, respectively, but Commissioner Cox dropped only 195 votes. Commissioner De Graffenreidt testified he "lost luster" in the black community and the voter turnout ebbed (confirmed by election statistics).

Arthur Kennedy, who narrowly lost by about 3% of the total votes cast in 1982, felt that a big turnout was important for him because the more people who voted, the better off he would be as a candidate. However, the turnout was low at election. Clearly, the matter that bothered Mr. Kennedy the most was the fact that three power brokers (as he describes them) whom he avoided and also did not solicit money from, were unhappy with him, and he feels two of them were behind a letter mailed out on the Saturday before the election. His staff advised him not to respond to it, but he wishes he had done so.

The court asked to see the letter and it was received as a court exhibit. The letter is on the letterhead of the Broward County Republican Party, reminding the voters of Fort Lauderdale that the property taxes in the county had doubled since the Broward County Commission was "taken over by Democrats" four years earlier. The letter went on to point out that the conservative Republican majority on the Fort Lauderdale City Commission had controlled spending and kept the city taxes in line. Then the letter specifically sounds the bugle for the Republican party faithful, pointing out that a majority of the top five finishers in the primary were Democrats, one a 27-year-old candidate running for the first time, and Arthur Kennedy, described as "a labor leader that has a direct interest in 'not rocking the boat, but sinking it,' [quoted from Miami Herald interview] if he gets elected." The letter then urged that Republican party members—presumably the only addressees of the letter—elect a conservative majority to the city commission and recommended four candidates: incumbents Bob Cox, Richard Mills, and newcomer candidates Rob Dressler and John Rodstrom. The fact that Art Kennedy was a former member of the Democratic Executive Committee was a matter undoubtedly not lost on the persons behind this election eve letter.

The letter was successful: The four persons recommended were all elected in the 1982 general election. The city also elicited from Mr. Kennedy that he used up half or more than half of his campaign funds in the primary campaign rather than holding them for the general election, despite the existence of only 11 candidates and the primary would only reduce the field to 10 candidates.

Arthur Kennedy candidly observed that nearly all the commissioners in the last two decades have been Republicans—all except for Mayor Young and Commissioner De Graffenreidt. He also acknowledged that Mayor Young is regarded in the white community as basically conservative, but that her support among "voters in the Northwest area … [is] almost a given."

Neither lawyer had seen the letter referred to by Mr. Kennedy (court exhibit 1), and there was no other evidence of partisan

activity in past city elections. The evidence does show the exclusive preference of the Broward Citizens Committee for Republican candidates.

## The Nine Factors

The first factor indicated in the Senate report and *U.S. v. Dallas County Commission*, 739 F.2d 1529, 1534 (11th Cir.1984), is the extent of any history of official discrimination "that touched the right of minority groups to ... participate in the democratic process." Turning to it at this time, this court permitted introduction of evidence of discrimination during the post-Civil War period in enactments by the State of Florida and during the reconstruction throughout the remainder of the 19th century and early 20th century. The relevance of this evidence to the city of Fort Lauderdale is dubious because of the fact that Fort Lauderdale was not even a trading post at the time of Reconstruction; the court can take judicial notice of the historical fact that Frank Stranahan's trading post on the New River was the nucleus around which Fort Lauderdale began, and a village began to take shape at the turn of the century, assisted greatly by the construction of Henry Flagler's railroad, which finally pushed down the Atlantic coast to Miami in 1896. As noted earlier, Fort Lauderdale did not become a city until 1911. Whatever may have been the situation in the state of Florida in the 19th century and the first half of the 20th century, there have been almost none of the usual badges of bias against minorities participating in the political process: There has been no white or segregated primary in the city; there has been no prohibition against single-shot voting, and no requirement for a majority vote. A poll tax was required to be paid for two years from 1911 to 1917; from 1917 to 1919 no poll tax was required. In 1919, women's suffrage was obtained and poll taxes were reinstated, but since 1929 there have been no poll taxes required. The elections are officially nonpartisan.

However, there was evidence of discrimination against blacks in the city of Fort Lauderdale in the past.

In 1922 an ordinance was enacted which created a legal "color line" segregating blacks into the northwest area of the city, west of the railroad tracks. A violation of this ordinance carried a penalty of both a fine and imprisonment. The ordinance remained basically in effect for 25 years.

In 1926 an ordinance was created which provided for the creation of a "Negro district" and "no residence or apartment house could be used to house Negro families with the exception of servants' quarters." Action was taken in 1929 to enforce the ordinance. In 1936 the boundary of the "Negro district" was redefined, and in 1939 the planning and zoning commission recommended an increase in the size of the "Negro district." A few months later, the ordinance was repealed with an ordinance restoring the "Negro district" to its earlier boundaries in 1942.

The advisory board recommended the acquisition of land for a buffer area around the "Negro district," and during the war Dillard School, the black high school, would be closed periodically so black children could work in the vegetable fields. That was challenged (unsuccessfully) in 1945 in federal court. See *Walker Civic League v. School Board*, 154 F.2d 726 (5th Cir.1946).

The segregation ordinance about the "Negro district" was repealed in 1948.[3]

Plaintiffs claim that Fort Lauderdale's abandonment of a district residency requirement in 1947 simply was a lock step or shadow effect to emulate the State of Flor-

---

**3.** There are other examples set forth in the evidence of discrimination, some tenuous to the point of being erroneous, such as newspaper clippings as to the Ku Klux Klan rallies in Central Florida. However, there have been some instances of discrimination in Fort Lauderdale; for example, the petition by some black residents to use the municipally-owned golf course during the 1950's. A city resolution (6247) expressed fear of adverse tourist reaction if the petition was granted. The United States District Court ordered integration of the golf course and the city sold the golf course. There were also various petitions to hire black police officers to patrol in the black residential areas.

ida in getting around *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944), and the striking down of the white primary in *Davis v. State ex rel. Cromwell,* 156 Fla. 181, 23 So.2d 85 (1945). However, the court cannot agree with plaintiffs' assertions because the simple fact of the matter is that Fort Lauderdale has had at-large elections of its city commissioners from the very beginning in 1911. Additionally, there has been no white primary, as such. There have been some requirements from time to time in the city's history that commissioners reside in certain districts but they still ran at-large.

■ There is no reason to conclude from the evidence in this case that the official discrimination, either in the State of Florida or in Fort Lauderdale, has adversely affected the right of the members of the plaintiff minority group either to register or to vote or otherwise to participate in the democratic process. This is particularly true when we consider that, generally speaking, black voters since 1970 have voted, percentagewise, as much as or more than white voters in every election but one.

Moving on to the second matter presented by the Senate report, the extent to which voting in Fort Lauderdale is racially polarized, we find a battle of expert witnesses with widely divergent conclusions. Plaintiff presented Dr. de la Garza, a professor at the University of Texas, while defendant relied on Dr. Bullock, a professor at the University of Georgia.

Dr. de la Garza relies on a bivariate statistical analysis; that is, he checks only the issue of race in determining what factors affected the votes cast for a candidate, whereas Bullock checked the voting patterns from a number of independent variables, including, but not limited to, incumbency of the candidate, campaign funds spent, whether male or female, whether newspaper endorsements were received, voter turnout either in the black or white community, the proportion of the registered voters who were black, and party—"in some instances" (although the

court does not believe this was fully explored or utilized.)

Although there has been some judicial consideration of bivariate vis-a-vis multivariate analysis (and that will be discussed later in this order), the court wanted to compare the analyses when tested against some actual events and realities in order to determine which theory seemed to be more sound and of more assistance to the court in determining whether the at-large election system in Fort Lauderdale impacted illegally on the rights of the black citizens of the city.

Dr. de la Garza's analysis was fairly simple in that he counted every vote cast by a voter and then used raw scores of the number of votes for black candidates vis-a-vis the number of blacks registered in the precincts, coming up with a regression figure ranging from .81 to .99, with 13 of 18 elections over .90 (de la Garza calculated all elections with a black candidate with the apparent exception of the 1963 primary and the 1979 elections).

His second regression reflects the percentage of votes received by a black candidate as a function of turnout ratio (number of votes cast by a precinct as a function of a number of votes they could have cast). Tr. 256. The regressions ranged from .51 to .99. When the two analyses are combined, the $R^2$ ranges from .82 to .99, with most over .91.

Dr. de la Garza counts vote totals rather than voters (at least he does so with the white precincts), and therein lies the statistical problem when methodology more suited for head-to-head elections is applied to this particular at-large system.

By comparison, Dr. Bullock examined the 12 elections since 1970: a primary and a general in 1971, 1973, 1975, 1977, 1979 (only four commissioners elected), and 1982. There was at least one black candidate in each of these elections, and these are the elections the parties have focused on. (He apparently also compared the 1969 elections.) Dr. Bullock considered several independent variables: newspaper endorsements, campaign spending, incumbency,

level of turnout in the black or white community, gender, as well as race, among others.[4] He noted that in three of the 14 elections, a black candidate received 40% or more of the support of the white voters. Note: There has been at least one black candidate in each of the 14 elections. In seven other elections, a black candidate received between 30% and 39.9% support of the white voters.

Dr. Bullock also examined 15 other elections in which Fort Lauderdale citizens could vote which had black candidates competing against white candidates. In those 15, a majority of Fort Lauderdale citizens preferred black candidates in four elections: the Florida Supreme Court election in 1976 (then Justice Hatchett, now Judge Hatchett of the U.S. Court of Appeals for the Eleventh Circuit), Alcee Hastings in the 1974 Public Service Commission primary, City Commissioner De Graffenreidt running for the Broward County Commission, plus another race. In addition, in other elections, four of the black candidates received 40% to 49.9% of the white vote.

In only two of the 14 Fort Lauderdale elections has a black candidate (Alston, in both instances) received less than 20% of the white vote; only those two races would indicate racial polarization under the Loewen standard (80%–20% polarization benchmark). Alston also ran less strongly in black precincts than had other black candidates.

Dr. Bullock also concluded that whites more generally vote for blacks than black voters for white candidates. Dr. Bullock's conclusion was that the variable of race is not one of the important variables. His conclusions were that the important variables are like this: The candidate is more likely to win a seat on the Fort Lauderdale City Commission if:

1. The candidate is an incumbent.
2. The candidate spends more.
3. The candidate receives newspaper endorsements.
4. White voter turnout is lower.

4. Dr. de la Garza agrees these factors, and more,

He concludes that race is not a statistically significant variable; in considering race along with the other four just listed, it only changes the result $^{6}/_{10}$ of 1%. Dr. Bullock adds that being a female increases the likelihood of finishing better—more so than the effect of race.

### Newspaper Endorsements

Dr. Bullock concluded that with one of the two major newspaper endorsements, the candidate would finish 1.4 places higher; with both of them, the candidate can expect to finish 2.75 places higher. The two newspapers involved were The Fort Lauderdale News and the Broward County edition of The Miami Herald.

### Problems with Professor de la Garza's Approach

Dr. Bullock sets forth three reasons why Professor de la Garza's theory is wrong: First, it has an artificial upper limit. E.g., if every white voter in the city voted for Commissioner De Graffenreidt, the only black candidate in the race, but also exercised his option to vote for four other candidates who necessarily were white, then the white voters could not be any more disposed favorably towards a black candidate than to cast a vote for that black candidate. Yet under de la Garza's theory, you would have a polarization score of 80 which would indicate racial polarization even under the Loewen theory. That would be racial polarization under the de la Garza theory, even though *every* white voter in the city had voted for the only black candidate.

The second reason Bullock concludes that de la Garza's theory is wrong is it depends on the number of minority candidates in the election, even if the voter attitude remains constant. Example: Assume there are 100 white voters and of that 100, 25 will vote for a black candidate every opportunity they have. The remaining 75 will never vote for a black candidate. Each voter can cast five ballots, and there will presumably be a total of 500 ballots

do affect elections.

cast. If one black candidate is running, the black candidate gets 25 votes of the 100 white voters, and that would be 25 votes of a total of 500 votes cast which, under the de la Garza approach, gives a polarization score of 95%. If there are two black candidates running, the black candidates would get two times 25, or 50 votes out of the 500 votes cast, which would give a polarization score according to de la Garza of 90. Similarly, three black candidates would attract 75 out of 500 votes and the polarization score would be 85. With four black candidates, the polarization score falls to 80, and with five black candidates, they get 125 votes, resulting in a polarization score of 75, according to de la Garza. Consequently, the attitudes in the white community in this illustration remain constant. The polarization score varies tremendously simply because of the number of options available to vote for black candidates.

In the third illustration, we assume the same voting attitudes of 100 white voters with 25 of them who will always vote for a black candidate. What will vary is the number of candidates the voter can vote for in a race, but only one black candidate is in each election contest. If you have a head-to-head race for the U.S. Congress with a black candidate competing with a white candidate, the 25 votes would end up with a de la Garza score of 75% polarization. However, in a hypothetical race for state representative (and the voters in this precinct can vote for two candidates for state representative), again, there is only one black candidate running, then 100 white voters would cast 200 ballots with 25 for the black candidate and the polarization score has now risen to 87.5%. If in the same election there are three members of the local school board running at-large, in the same precinct of 100 white voters, the black candidate would get 25 of those, producing a polarization score of 93.75%. Eventually you get to five slots to be filled, such as in the Fort Lauderdale City Commission. The same situation now produces a polarization score of 95%.

Dr. de la Garza does concede certain problems with his approach in attempting to determine voter polarization in Fort Lauderdale with his comment that "you can't translate voter polarization in a conventional sense into this kind of election system," and "this particular type of at-large election is not readily quantifiable by political science."

Dr. de la Garza also could not explain, using the actual example from the 1973 election where there were 31 candidates, only one of whom was black, and if a white voter cast a vote for the black candidate and four votes for white candidates, how those votes and that voter are not racially polarized under his bivariate theory. The nearest thing he could give as a reason for this apparent flaw in his theory was that the white voter should have single-shot (bullet voted) his vote for the one black candidate if he really wanted the candidate to win.[5] Comparing the two approaches, the court is left with very little confidence in the approach of Dr. de la Garza in view of its apparent ignoring of factors which plainly affect election results.

The Supreme Court in *Teamsters v. U.S.*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977), cautioned that "... statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." *Id.* at 340, 97 S.Ct. at 1856.

The Fifth Circuit in *Wilkins v. Univ. of Houston*, 654 F.2d 388 (5th Cir.1981), *reh'g denied*, 662 F.2d 1156 (5th Cir.1981), repeated its panel opinion statement on rehearing: "multiple regression analysis is a largely sophisticated means of determining the effect that any number of *different factors* have on a particular variable." [Emphasis supplied.] 654 F.2d at 402, 662 F.2d at 1157. Only one expert testified in the *Wilkins* case and introduced a series of independent variables affecting salary in a

---

**5.** Single-shot or bullet voting is to vote for only one—or perhaps two—candidates in order to give maximum effect to your vote for that candidate.

discrimination case. These various independent variables showed that when sex was added as the ninth independent variable, sex (gender) as a factor explains only .8 of 1% more of the variation around the average salary (the dependent variable).

■ In the instant case, Dr. Bullock's model shows that when race is added to the other independent variables he applied to the voting statistics for past city commission races, the factor of race explains only .6 of 1% of the dependent variables of candidate success. Consequently, a totality of the evidence, including Dr. de la Garza's admitted difficulties in applying his bivariate analysis to the city's at-large election system, compels the conclusion there has been no racial polarization showing a violation of the Voting Rights Act.[6]

A Voting Rights Act case, *Jones v. City of Lubbock*, 727 F.2d 364 (5th Cir.1984), *reh'g denied*, 730 F.2d 233 (5th Cir.1984), reveals that the city of Lubbock, Texas, has a total population only slightly larger than Fort Lauderdale, with a Mexican-American population of 17.9%, about halfway between Fort Lauderdale's 1970 black population percentage of 14.6% and its 1980 black population percentage of 21%; additionally, there is an 8.2% black population in Lubbock which, unlike Fort Lauderdale, had never elected a minority group member to the city council, probably because of its majority vote requirement, again unlike Fort Lauderdale. The demography in Lubbock bears considerable resemblance to Fort Lauderdale.

Seldom does this court quote at length from any judge's analysis or opinion, particularly a concurring opinion, but Judge Patrick Higginbotham's opinion is most applicable to the instant case, as follows:

> Care must be taken in the factual development of the existence of polarized voting because whether polarized voting is present can pivot the legality of at-large voting districts. The inquiry is whether race or ethnicity was such a determinant of voting preference in the rejection of black or brown candidates by a white majority that the at-large district, with its components, denied minority voters effective voting opportunity. In answering the inquiry there is a risk that a seemingly polarized voting pattern in fact is only the presence of mathematical correspondence of race to loss inevitable in such defeats of minority candidates. The point is that there will almost always be a raw correlation with race in any failing candidacy of a minority whose racial or ethnic group is as small a percentage of the total voting population as here. Yet, raw correspondence, even at high levels, must accommodate the legal principle that the amended Voting Rights Act does not legislate proportional representation. More complex regression study or multi-variate mathematical inquiry will often be essential to gauge the explanatory power of the variables necessarily present in a political race. Nor will math models always furnish an answer. A healthy dose of common sense and intuitive assessment remain powerful components to this critical factual inquiry. For example, a token candidacy of a minority unknown outside his minority voting area may attract little non-mi-

---

**6.** In many ways the instant case bears a striking statistical resemblance—at least in its development—to a case from the pay discrimination field, *Boylan, et al. v. The New York Times.* The *Boylan* plaintiffs were women employees of The New York Times, but the heart of the plaintiffs' classes were the female reporters. They claimed they were discriminated against paywise because of their gender, and the bivariate analysis based on sex alone supported their claim dramatically, much like Dr. de la Garza's bivariate regression analysis on race in the instant case.

However, as other valid independent variables were tested, such as the number of Pulitzer Prizes won, years of college, work experience prior to coming to work for The New York Times, seniority and tenure, etc., the disparity in pay's strong statistical support had diminished dramatically from what it appeared to have been at first. Alas, for purposes of this court's citations, the case settled a few days prior to trial in the United States District Court for the Southern District of New York.

<br>

nority support and produce a high statistical correspondence of race to loss. Yet, one on the scene may know that race played little role at all. In sum, detailed findings are required to support any conclusions of polarized voting. These findings must make plain that they are supported by more than the inevitable byproduct of a losing candidacy in a predominately white voting population. Failure to do so presents an unacceptable risk of requiring proportional representation, contrary to congressional will.

730 F.2d at 234.

■ For the third factor considered by the Senate report and the court in *Dallas County*, the city has not had a majority vote requirement or anti-single-shot provisions or any other voting practices or procedures traditionally used to enhance the opportunity for discrimination against minority groups or its black citizens. The city has used at-large elections from the very beginning of the city, and it was not something that was incorporated to evade or circumvent the law of the land. As at-large elections are not prohibited *per se* by the Voting Rights Act,[7] *United States v. Dallas County Commission*, 739 F.2d at 1534 (11th Cir.1984), this court finds no error in the continued use of the at-large system.

■ The fourth factor is whether there is a candidate slating process. There is not one in the city and no evidence has been adduced to that effect. Plaintiffs made an effort to intimate that the Broward Citizens Committee was a slating process under this factor. The Broward Citizens Committee is a group that interviews candidates but it recommends only Republicans, even though the city election is officially nonpartisan. This court cannot conclude from the evidence that it is necessary for a candidate to receive approval from the Broward Citizens Committee before success is enhanced or assured in the city elections. The evidence does not show that even one of the black candidates who has run for the Fort Lauderdale City Commission is a Republican. Inasmuch as former Mayor and long-time Commissioner Virginia Young does not receive the recommendation of the Broward Citizens Committee—despite her generally being regarded as a conservative in politics[8]—one must conclude that this unofficial organization[9] simply furthers the interest of candidates who are Republicans. There are and have been prominent black citizens of Fort Lauderdale who are Republicans, but no evidence has been offered to indicate they ever sought the recommendation of the Broward Citizens Committee.

The fifth factor is the extent of the effects, if any, of discrimination in areas such as education, employment, and health on minority group members, "which hinder their ability to participate effectively in the political process."

Dr. de la Garza, plaintiffs' expert, testified that in nine of the twelve elections from 1971 to 1982, inclusive, black "turnout is equal to or higher than white turnout." In the other three elections, white turnout exceeded black turnout by less than 1% in two of them, and in only one election did white voter turnout exceed that of the black voters by as much as 2% (22% to 20%). However, in five straight elections black voter turnout was larger by more than 8%, occasionally as much as 17%. Consequently, although the court received evidence presented by plaintiff in these areas, the qualification in the Senate report of effects "which hinder their ability to participate effectively in the political

7. In fact, court after court has explicitly avoided such a holding: *United States v. Dallas County Commission*, 739 F.2d at 1534 (11th Cir.1984); *United States v. Marengo County Commission*, 731 F.2d 1546, at 1563 (11th Cir.1984). *See also Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982); *Brown v. Bd. of School Com'rs of Mobile County, Ala.*, 706 F.2d 1103, at 1104 (11th Cir.1983); *N.A.A.C.P. v. Gadsden County School Board*, 691 F.2d 978, at 981 (11th Cir.1982).

8. See, e.g., testimony of Arthur Kennedy.

9. The testimony as to whether it is a registered political organization was inconclusive.

process" makes such evidence irrelevant as a practical matter.

Nevertheless, the court has considered whether any effects of discrimination—or lingering effects—in the field of education would adversely affect political participation.[10] The statistics referred to in Professor de la Garza's testimony indicate it did not affect the turnout of the black voters.

The court has even contemplated whether any lingering effects of education discrimination would affect the quality of the black candidates. That does not appear to have been the case: Alcee Hastings was a lawyer at the time of his candidacy; Commissioner De Graffenreidt was an experienced educator and past Classroom Teacher of the Year; Art Kennedy was a high school coach and president of the county's Classroom Teachers Association, while Louis Alston was a college student at the time of his candidacy.

There was one area which might conceivably affect the participation in the political process, and that is a disparity in income among white residents vis-a-vis black residents. In 1969, the median income was $7,674 for white families and $4,626 for black. In 1979, the figures were $15,410 and $9,761, respectively.

This differential conceivably could affect contributions, although Art Kennedy had virtually no trouble securing contributions.

The matter of employment listed in the Senate report seems subsumed in income.

Again, except as indicated above, there seems no effect in ability to participate equally.

Sixth, whether past political campaigns have been characterized by overt or subtle

racial appeals. No evidence has been introduced in this trial which would begin to suggest there has been any such tactic in political campaigns in the past. On the contrary, there was evidence that the commissioners in the mid–70s ran as a "team" and that Commissioner De Graffenreidt was a member of the team. In addition, in the 1982 election, Arthur Kennedy testified that he and the present mayor, Robert Dressler, urged voters to vote for both of them.

The seventh factor is the extent to which minority group members have been elected to public office in the city. In view of the parties' concentration on the six elections since 1970, the court has largely limited its consideration of elections to that period as well. There has been a black candidate in every election, and two in 1982. In the elections with "open seats"—there have been four "open seats," one in 1971, two in 1973, and one in 1982—there has been one black candidate, Andrew De Graffenreidt, elected, and another who narrowly lost, Art Kennedy in 1982. Kennedy lost by 568 votes out of 17,151 cast, for a margin of defeat amounting to 3.29%.

■ This factor was covered in greater detail earlier. After all, the proof is in the pudding. This court dealt with this factor at the beginning because it feels this factor is by far the most important of the nine listed by the Senate and Court of Appeals and it is the only factor spelled out by The Congress in The Voting Rights Act. E.g., if the other eight factors show no reason even to suspect a violative condition under the Voting Rights Act, but minority candidates have had little or no chance of election despite numbers to indicate electoral

---

**10.** The school system is not maintained on a citywide basis. It is operated by a county school board so the City of Fort Lauderdale has no control or voice in the operation of the schools, including assignment of students or quality of instruction. There have been no schools built in the white residential areas of Fort Lauderdale since the 1960's, largely because the population centers—particularly for young families—have moved to the western portion of the county, except for the largely child-less condominium dwellers along the beach and Intracoastal. A second factor troubled the court about plaintiffs' expert testimony on education: he had not included the high school sitting immediately outside the city limits of Fort Lauderdale (Northeast High School), which high school services a large population area of Fort Lauderdale. However, in his statistics, he included several other schools not located in the city.

strength, the minority group may well be able to show a violation. Conversely, if the minority group is having success at the polls—especially if the success exceeds its statistical electoral strength—then a strong showing in all the other factors could scarcely justify relief to that group.

The two additional factors set forth in the Senate report may deal more exclusively with the issue of intent but will be addressed by this court anyway, despite the amendment of the Voting Rights Act. The eighth factor is whether there is a significant lack of responsiveness on the part of elected officials to the needs of the minority group members. Most of the evidence on this factor was introduced by the city. For example, the city called the city recruiting officer, who is in charge of the minority recruiting program, particularly for police and fire department positions. Not only do they use radio advertising, but he, along with a police officer, goes to various community functions, community colleges around the state and country in recruiting efforts.

The city has been operating under a 1980 consent decree to achieve 11.25% black fire fighters and police officers. By 1982, the city had achieved a 12.9% figure of its fire fighters who were black. The same goal was set for the police department (based on the 1970 census), but in 1982 the city was only at a 6% manning level.

The city had validated its police entrance examination in 1977 and it was considered valid. A new recruiting officer adopted a new test in 1982 to increase the passing rate for minorities from 18% to 25%, and currently it is in excess of 50%. The explanation for being below 11.25% in police officers results largely because 15 minority police officers left. Apparently a number of cities are under the stimulus of a consent decree in minority hiring and are raiding each other's police departments in the sense of offering attractive benefits to minority officers. Fort Lauderdale's salary and benefits program became competitive, perhaps attractive, in mid-1984.

The city has been engaged in a recruiting program attempting to add minorities to the police and fire departments for several years prior to the consent decree in 1980, particularly in the area of public service aides who then moved into the police departments or fire departments.

Unfortunately, a reverse discrimination suit was filed by white police officers in federal court, and that resulted in an injunction against any further promotional testing for the rank of police sergeant, thereby freezing the situation as of a previous promotion list.

In 1979, Commissioner De Graffenreidt was reported in The Miami Herald to have said that the city has done everything possible with respect to minority hiring.

The city also called Assistant City Manager James Hill, who happens to be black and has been the assistant city manager since 1970. He is the affirmative action officer for the city in addition to his other duties.

The city engineer testified that Fort Lauderdale still does not have sanitary sewers in all of the areas within the city limits. Because of Fort Lauderdale's sandy soils and low population in the past, sanitary sewers were not the compelling need they may become in the future. A program was developed and instituted to install sanitary sewers, generally working from the ocean westward. In 1970, a consultant performed a master plan for sewers for the city of Fort Lauderdale, and the city anticipated having all of the city furnished with sanitary sewers by sometime in 1975 or 1976. However, about the time of the "master plan," EPA came into existence and ordered the cessation of gravity sanitary sewers, changing the entire treatment process, treatment plant locations in Fort Lauderdale, and doing away with all treatment plants which contributed effluence into the waterways. (The court can take notice that more than 200 miles of canals and waterways exist in the city of Fort Lauderdale.) These sanitary sewer-deficient areas are in both the black and white sections of the city, primarily in the

southwest section (largely white), with some in the northwest, but only very small portions in the northeast or southeast quadrants of the city.

The city engineer further testified that procedure for installing sanitary sewers is that a petition is filed by the residents of a neighborhood requesting installation of sewers and installation recommendations depend on certain engineering factors, such as hydraulic design, etc. The city commission receives various technical data from the engineering department and then holds public hearings in passing a resolution declaring the necessity of installation, and the cost of the assessment is made against the individual property owners. A procedure has been implemented whereby the payments can be spread over several years at simple interest in order to accommodate the low income homeowner. However, septic tanks work fairly well in Fort Lauderdale's sandy soil; none of the predominantly black areas, which are still unsewered, have petitioned for sanitary sewers.

The last unpaved street in Fort Lauderdale was paved about six months prior to the hearing and it was in a white neighborhood.

The city also called its deputy personnel director who outlined the efforts made by the city to recruit minority employees into the city's work force. They are spending about $100,000 to $150,000 a year in that area alone: up to $20,000 a year for advertising, and the balance on recruiting trips to other cities attempting to recruit personnel.

Evidence was also received as to promotion of black city employees vis-a-vis white city employees. In 1981, although there were more white employees promoted, the percentage of eligible whites promoted was 48% while the percentage of eligible blacks promoted was 95%. Similar situations continued on into both 1982 and 1983, as well as the first part of 1984.

There still is an average income disparity, but this matter was naturally not the subject of statistical treatment by either side. There were fewer blacks, for exam-ple, in the engineering department and no breakdown was given as to the effect of seniority and tenure on compensation. Consequently, the compensation matter seems to have some similarity to the Fifth Circuit case of *Wilkins v. Univ. of Houston, supra.*

Since the year before the consent decree, the city has hired 2,000 employees, 22% of them black.

The city also presented evidence as to code compliance with the minimum housing codes.

Without the impetus of a consent decree, the city commission ordered a part of the northwest section of the city (largely black) in October of 1982 to be upgraded and an equivalent of one inspector assigned on a full-time basis to concentrate on that area.

The director of parks and recreation for the city testified that 550 acres of parks exist in Fort Lauderdale, ranging from small "vest-pocket parks" to Fort Lauderdale Beach. There is no line of hotels or motels separating the public from Fort Lauderdale's beaches as exists in many other Florida cities. There has been no question the city's beach has been integrated, at least since 1961. Of the 550 total acres, 190 acres (32% of the total) of the parks are situated in the northwest section (largely black). However, a portion of that 190 acres was acquired several years ago by the city for a park but has not yet been developed. The parks in the white neighborhood areas of the city are not only integrated, but are freely used by black persons. The major parks in the city have full-time recreation program staff members.

The city also introduced evidence as to the use of the Community Development Grant funds, which have been received by the city basically since 1974. In this 10-year period, Fort Lauderdale has received almost $21,400,000. Of that figure, 90% to 95% of the funds have been spent in the northwest sector. The funds have been used for matters such as construction of

the Dr. Von Mizell Center, rehabilitation and modernization of public housing, renovation of their low-income housing, rental rehabilitation program, etc.

The totality of evidence indicates that the responsiveness of the city is hardly perfect, but most of the inequities that exist are from difficulties in recruiting competition in the police department area. There the city has made bona fide and intensive efforts to overcome the problems of recruiting or retention. Another area of difficulty is the disparity in income of city employees, much of which results from seniority factor of employees who have been with the city for up to 20 or 30 years. The evidence does persuade the court that the city has made intensive efforts, certainly in the last 10 to 15 years, to correct any imbalances and has been overcompensating during that period of time in many programs in an effort to improve and correct any imbalance.

The ninth factor deals with the tenuousness, if any, of the policy underlying the use of any voting qualification practice or procedure. There is no questionable voting prerequisite or procedure involved in this case. The only question has been whether the city's at-large system itself violates the Voting Rights Act. The city has had the at-large system since its creation in 1911, and this court does not find from the totality of evidence indications that its election policy either was adopted or has been maintained to discriminate against minority citizens.

### Summary

This court has gone through the nine factors indicated as being relevant by the Senate as well as the Court of Appeals. The totality of the evidence does not warrant a finding that Fort Lauderdale's at-large system of electing commissioners, with the highest vote-getter becoming the mayor, violates the Voting Rights Act, as amended.

Fort Lauderdale simply has very little resemblance to the many cases which have held a violation of the Voting Rights Act. Fort Lauderdale, with a black population of 14.6% in 1970 which had climbed to 21% by 1980 because of a plateauing of the white population, has elected a black commissioner three times in the six recent elections. The leading cases are decidedly different by comparison: *Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982), where the black population of Burke County, Georgia, was 53.6% while only 38% of the registered voters comprised black voters and no black had ever been elected to the board of county commissioners; *United States v. Marengo County Commission*, 731 F.2d at 1563 (11th Cir.1984), had a black population in the county of 55.2% and 44% of the registered voters were black, but the only black ever elected to county office was a county coroner. In *N.A.A.C.P. v. Gadsden County (Florida) School Board*, 691 F.2d at 981 (11th Cir. 1982), the county population was 59% black with 49.36% registered voters being black, but only one black had ever been elected to the school board. In *United States v. Dallas County Commission*, 739 F.2d 1529 (11th Cir.1984), the population of Dallas County, Alabama, was 52.3% black, while 43.8% of the registered voters were black, but no blacks in recent history had ever been elected to any county office.

The equal opportunity to participate in a political process and to elect representatives of their choice is best shown at the polls. All parties, lawyers, experts, witnesses, et al., agree that an "open seat" affords the best chance for a candidate to be elected. There have been four open seats since 1970 (only one since 1973), and a black candidate won one of them.[11] Considering the minority percentage population in 1970 of 14.6%, one out of four would be comfortably above a proportional represen-

---

**11.** With two "open seats" in 1973 and only one black candidate, it would have been impossible

for black candidates to win more than three.

**1108**

tation figure—even if that were not specifically proscribed by Congress. If Mr. Kennedy had won in 1982, this lawsuit would be illogical and would be virtually frivolous under these circumstances. As it turns out, he lost by a mere 3.2% and attributes his defeat to an election eve letter on the letterhead of the county Republican party urging Fort Lauderdale citizens to vote for four Republicans and his failure to respond to it.

If one examines it another way, the result does not vary: Since 1970 (counting the 1979 mayoralty race), there have been 75 white candidacies for city commission, of which 27 were successful in being elected, for a percentage of 36%, while there have been seven black candidacies, of which three were successful, for a percentage of 43%.

What has emerged from the evidence is that the bulk of Fort Lauderdale citizens are conservative, largely Republican. Although the city races are officially nonpartisan, the city commission has been Republican for approximately two decades. Not one of the black candidates has been a Republican according to the evidence.

What has also emerged from the evidence is that the white voters of this city are more than willing to vote for black candidates. For example, Commissioner De Graffenreidt would have won re-election in 1975 and 1977 on votes from white precincts alone. In addition, in 15 non-city races, e.g., for Florida Supreme Court Justice, Florida Public Service Commission, and the county commission, the white voters of Fort Lauderdale in four different races have given a majority vote to a black candidate who was competing with a white candidate, and in four other elections, black candidates received 40% to 49.9% of the white vote.

The evidence fails to show a violation of the Voting Rights Act in Fort Lauderdale's at-large system for its city commission.

Order to be entered accordingly.